ROSEMARIE ERICH, CONCEPCION REIDER AND ELIZABETH ZONDLER, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS–APPELLANTS, v. GAF CORPORATION, A DELAWARE CORPORATION, DEFENDANT–RESPONDENT, AND JOHN DOES, BEING FICTITIOUS NAMES AND HERBERT HOES, BEING FICTITIOUS NAMES, INDIVIDUALLY, DEFENDANTS.

Argued January 19, 1988—Decided May 10, 1988.

*Richard S. Miller* argued the cause for appellants (*Williams, Caliri, Miller & Otley,* attorneys).

*Francis X. Dee* argued the cause for respondent (*Carpenter, Bennett & Morrissey,* attorneys; *Francis X. Dee* and *Laurence Reich,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This case concerns the appropriate standard of judicial review to be used in analyzing an employer's determination of employees' entitlement to accrued vacation pay on layoff. There are two aspects to the issue, namely, (1) whether the question should be decided under federal law because the Employee Retirement Income Security Act of 1974, 29 *U.S.C.A.* §§ 1001 to 1461 (ERISA) preempts this aspect of employee relations, and, (2) depending on whether federal or state law governs, what standard of review should apply.

This case presents an unusual analytical exercise in that both parties have argued before us that this matter is to be decided under federal law despite a divergence in federal precedent regarding the issue, *see California Hosp. Ass'n v. Henning,* 770 *F.*2d 856 (9th Cir.1985), *cert. denied,* 477 *U.S.* 904, 106 *S.Ct.* 3273, 91 *L.Ed.*2d 564 (1986) (vacation pay not preempted by ERISA), and *Holland v. National Steel Corp.,* 791 *F.*2d 1132 (4th Cir.1986) (vacation pay preempted), and despite a federal regulation expressly disclaiming ERISA preemption of vacation pay benefits. 29 *C.F.R.* § 2510.3–1(b)(3)(i) (1987).

The trial court, believing that ERISA permitted but a narrow scope of judicial review of plan administration, limited its review to a consideration of whether the employer's action in disallowing the vacation pay or changing the vacation pay policy was "arbitrary or capricious." The standard is familiar. We use it when reviewing agency action, *Public Serv. Elec. and Gas Co. v. New Jersey Dep't of Envtl. Protection,* 101 *N.J.* 95, 103 (1985), or one similar in reviewing certain private actions impacting on the public interest, *Berman v. Valley Hosp.,* 103 *N.J.* 100, 106–08 (1986). Without suggesting that

we are bound by the stipulation of the parties, we find that the policies that favor non-preemption in this area of employer-employee relations support a broader standard of review under either state or federal law. Consequently, we reverse the judgments below and remand the case for further consideration in accordance with this opinion.

## I

As noted, this case arises from a dispute over vacation pay that discharged employees of GAF claim as their due. In essence, the question is whether an employee discharged in mid-year is entitled to be paid, on an anniversary-year basis or on a calendar-year basis, for the prorated unused vacation days accrued during the year of discharge in addition to the unused vacation days from the previous year.

The controversy was caused by a shift in the employer's vacation policy from the anniversary-of-employment basis to the calendar-year basis. At stake for terminated employees is the value of earned vacation days lost by the shift. This issue may not seem momentous in its recital, but it means a lot to those who worked hard for a few days or weeks of vacation. The plaintiff employees are particularly aggrieved by what they regard as GAF's unilateral change in the terms of the employment for the purpose of cutting costs in anticipation of mass layoffs. Because this case comes before us on review of the grant of GAF's motion for summary judgment, we are bound to accept plaintiffs' version of the events as true and to accept all the favorable inferences that might be drawn from those facts. *E.g., Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 61 (1980).

The factual background for these issues may be drawn from the statement of Edith H. Gazda, GAF's former Director of Compensation. She explained that under GAF's pre–1980 general vacation policy, no vacation was earned at all unless an employee had worked for a fixed period of time, either six

months or a year. Only then would an employee be allowed to take vacation. "Thus, there was a continuing cycle of working one year for vacation and taking it the next." She also noted that the company's 1979 Policy Manual provided that employees terminating service with GAF "would be entitled to one-twelfth (1/12) of their unused vacation pay for *each month they worked in a calendar year* in which they terminated." (Emphasis added). However, the 1979 policy had a flaw that enabled employees to beat the system by taking their full vacation entitlement early in a work year, prior to an anniversary date, only to return to work and announce they were quitting. By contrast, responsible employees who gave notice of their intent to resign received only a prorated portion of their vacation pay based on the number of months they had worked that year. Yet another problem was posed by pending changes in state law that would require companies to reimburse employees for the amount of vacation they had earned by working prior to the terminations on the basis of an "earned-right" concept of vacation pay.

Consequently, the Director of Compensation developed a new policy in 1980 embracing an "earned-right" concept of vacation pay as determined by the employee's anniversary service date. Under this new program employees worked from anniversary date to anniversary date; on reaching their anniversary dates, employees would be entitled immediately to take the entire entitlement for the previous work year. Each month thereafter, the employees would earn and accrue one-twelfth of their vacation entitlement for the current year. Employees could not take accrued time until their next anniversary date, but employees leaving prior to their next anniversary date were entitled to a prorated percentage of their vacation entitlement.

This new policy was incorporated in the 1980 Policy Manual (1980 PM) and was implemented throughout the GAF organization. In response to employee inquiries, the Director prepared a number of examples of how the policy was to be applied. Plaintiffs rely on these examples to support their contentions.

The Director stated that when she retired in March 1981, the proper method of calculation for paying terminating employees for unused vacation days under the 1980 PM was as follows:

(a) ascertain the employee's anniversary date and as of that date credit the employee with an entire year's worth of vacation;

(b) calculate the number of months from an employee's prior anniversary date to the date of termination, crediting partial months of service including two weeks or more as a whole month;

(c) for each month of service after the employee's anniversary date, credit the employee with an additional one-twelfth ($\frac{1}{12}$) of the vacation entitlement that the employee would have been able to take on the following anniversary date;

(d) from the number of days thus calculated, subtract any vacation days taken since the employee's last anniversary date; and

(e) multiply the total days by the employee's daily salary.

Again, assuming as we must the validity of plaintiffs' allegations, the 1980 vacation pay policy was consistently applied through that year and most of 1981. Plaintiffs allege that toward the end of 1981, however, GAF knew that it would be terminating substantial numbers of employees. Accordingly, management proposed to "change[ ] the rules of the game so as to provide that employees did not earn vacation [benefits] from their anniversary dates, but rather from January 1 of the calendar year in which the vacation would be taken." Another GAF official noted: "[t]he old policy stated that the employees earned vacation days based on their anniversary year. [T]he new policy eliminates the anniversary year concept in favor of the calendar year concept." Plaintiffs allege that the losses suffered are substantial, and point to a hypothetical example of employees with anniversary dates of September 1 and termination dates of January 31, 1982. Presuming that the employees had taken all of their vacation in the summer of 1981 and

took no vacation after 1982, the employees would have been entitled to be paid five-twelfths of their vacation entitlement under the old policy—entitlement for September, October, November, December and January—and only one-twelfth of their vacation entitlement (entitlement for January) under the new policy.

We include only the procedural details necessary for our disposition. Plaintiffs, who are terminated employees aggrieved by the withholding of their vacation pay, commenced their suit in the Law Division in late 1982, alleging that GAF had breached the contractual terms of employment set forth in the 1980 PM. Plaintiffs sought to have the action certified as one on behalf of a class consisting of all persons nationwide who were salaried non-union employees of GAF and who were terminated by the company between December 1, 1981, and December 13, 1982. The trial court directed the parties to brief the question of whether ERISA preempted plaintiffs' claims. Based on the trial court's ruling that ERISA preempted the issue, plaintiffs were directed to file an amended complaint alleging violations under that Act. The trial court then certified the action as involving a nationwide class. Before giving notice to the class, GAF was given an opportunity to file a cross-motion for summary judgment. At that time, the trial court summarily disposed of the contentions of the plaintiffs on the merits, holding that the "internal sense" of the 1980 PM and the circumstances surrounding its enactment supported GAF's contention that "a paid vacation is attributable to work previously rendered rather than to work expected to be performed." The trial court concluded that even if the 1980 PM were arguably ambiguous, the appropriate test was whether GAF's interpretation was "arbitrary and capricious." *Tanzillo v. Local 617, I.B.T.*, 769 *F.*2d 140, 147 (3rd Cir.1985); *Struble v. New Jersey Brewery Employees' Welfare Trust Fund*, 732 *F.*2d 325, 333 (3rd Cir.1984). The Appellate Division affirmed in an unreported *per curiam* opinion on the basis of the opinion below. We granted certification. 108 *N.J.* 193 (1987).

## II

A recent commentator has succinctly summarized the countervailing policy arguments at stake in the issue of preemption. Note, "Unfunded Vacation Benefits: Determining the Scope of ERISA," 87 *Colum.L.Rev.* 1702 (1987). After analyzing the relevant precedent and sources, the author observes that "[n]either the legislative history of ERISA nor the structure of the Act supports a reading that it includes unfunded vacation benefits within its scope. In addition, Congress' overall purpose in enacting ERISA would be frustrated if state law governing unfunded vacation benefits were preempted." *Id.* at 1708.

The rationale that underlies this conclusion is the illogic of a finding that Congress would have acted to preempt state law without providing any correlative federal regulatory standards. A clear distinction has been drawn between federal regulation of unfunded and funded employee benefits with the latter primarily being seen as pension benefits subject to a very complex set of regulations governing the conduct of employers.

> The legislative history indicates that Congress' primary concern in enacting ERISA was to control two major abuses, "mismanagement of funds accumulated to finance such benefits, and failure to pay employees the benefits promised" from the accumulated funds. Vacation benefits paid from an employer's general assets present neither of these problems; they are funded by the same resources that fund the ordinary payroll. Therefore, no special fund to administer and no special risk of loss or nonpayment exist. [*Id.* at 1709 (citation omitted) (footnotes omitted).]

Hence, we agree that it is probably incorrect to assume that Congress intended that issues of vacation pay should become issues of federal law. But since the parties have argued the case on the basis that the vacation pay issue is prempted by ERISA, we must consider how courts would review such matters under federal law. What is at stake here in the choice of the standard of judicial review is very significant. As GAF argues forcefully in its brief, the majority view of the standard of judicial review of determinations of claimed eligibility under ERISA is whether or not the plan administrator or trustee

acted "arbitrarily or capriciously." *Holland v. Burlington Indus., Inc.*, 772 *F*.2d 1140, 1149 (4th Cir.1985), *aff'd sub nom. Brooks v. Burlington Indus., Inc.*, 477 *U.S.* 901, 106 *S.Ct.* 3267, 91 *L.Ed.*2d 559 (1986); *Tanzillo v. Local 617, I.B.T., supra,* 769 *F*.2d at 147; *Ellenberg v. Brockway, Inc.*, 763 *F*.2d 1091, 1093 (9th Cir.1985). So settled is the standard that it is described as the "black-letter rule." *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 *F*.2d 1048, 1049 (7th Cir.1987) (Posner, J.). The employer recognizes, as we do, that the "arbitrary and capricious" standard has been characterized as being highly deferential, *Struble v. New Jersey Brewery Employees' Welfare Trust Fund, supra,* 732 *F*.2d at 333, and limits the judiciary's role to determining whether the trustee's or plan administrator's interpretation of the plan was rational, not whether it was fair. Thus, in GAF's view, as long as its interpretation and modification of the 1980 vacation guideline was reasonable, they must, as the lower courts found, be upheld.

But it is precisely because Congress has extensively regulated the conduct of employers in the handling of funded pension benefits that courts have taken a necessarily limited view of their judicial role. Thus, when Congress has " 'establish[ed] standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and * * * provid[ed] for appropriate remedies, sanctions, and ready access to the Federal courts,' " *Powell v. Chesapeake and Potomac Tel. Co.*, 780 *F*.2d 419, 421 (4th Cir.1985), *cert. denied*, 476 *U.S.* 1170, 106 *S.Ct.* 2892, 90 *L.Ed.*2d 980 (1986) (quoting 29 U.S.C. § 1001(b)), courts should wisely exercise deference. But if we apply these same standards in the case of unfunded vacation pay and all state regulation is preempted, vacation benefits would be left unregulated because of the apparent lack of any federal standards that govern the conduct of employers in this area. "Interpreting the preemption clause so broadly, therefore, frustrates Congress' objective to minimize the mismanagement of funds and secure payment of benefits for employees, and deregulates

the field without any consideration of the impact on employers and employees." "Unfunded Vacation Benefits," *supra,* 87 *Colum.L.Rev.* at 1710 (footnote omitted).

In *Bruch v. Firestone Tire and Rubber Co.,* 828 *F.*2d 134, 147 (1987), the Third Circuit recently held that in the case of unfunded plans, as here, not involving neutral plan administrators, the standard of review under ERISA is less deferential and requires a broader inquiry under "principles of contractual construction." Because the district court's scope of review in the *Firestone* case was "outcome determinative," the Third Circuit remanded for further proceedings the trial court's finding of no "arbitrary or capricious" decisionmaking by the employer. *Id.* at 147. Judge Posner noted in *Van Boxel, supra,* 836 *F.*2d at 1049, that "there is growing skepticism about the orthodox [arbitrary and capricious] approach." He suggests yet another alternative: "a sliding scale of judicial review of ERISA trustees' decisions." *Id.* at 1053. The factors that suggest that ERISA does not preempt the unregulated field of vacation severance pay tend to suggest that the scale of judicial review should allow for "the necessary adjustments for possible bias in * * * the trustees' decision[s]." *Id.* at 1053.

*Certiorari* to the United States Supreme Court has been granted in *Firestone* to resolve the federal conflict regarding the appropriate standard for judicial review of an employer's determinations under ERISA. —— *U.S.* ——, 108 *S.Ct.* 1288, 99 *L.Ed.*2d 498 (1988). As we await that resolution, rather than create a conflict within New Jersey, depending on the choice of state or federal forum, and because we believe that the policies of the law with respect to preemption do not apply with equal force to unfunded vacation pay benefits, we conclude that the *Firestone* standard is the correct standard to be applied in these circumstances. That standard is similar to the standard of review that would be applicable under state law.

Before us GAF argued that regardless of the test employed, its conduct met both standards and that this finding is implicit

in the trial court's decision. In the alternative, GAF argues that we can resolve the application of either legal test to the facts. We decline to make that evaluation on the record before us.

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division for further proceedings in accordance with this opinion. That court shall determine whether or not plaintiffs have established a claim based on principles of "contractual construction." *Bruch v. Firestone Tire and Rubber Co., supra,* 828 *F.*2d at 147. It shall also resolve whether the record before it suffices to dispose of the claims summarily on the basis that there is no genuine issue of fact about whether plaintiffs' pleadings and allegations establish a cause of action for contractual claims of compensation.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*For affirmance* —none.