**Gerald W. DOLEZAL, Plaintiff,**

v.

**CONCERT HEALTH PLAN, d/b/a Concert Health Plan Insurance Company, an Illinois Corp. Defendants.**

**No. 05 C 5254.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 20, 2005.

Paul L. Langer, Paul M. Drucker, Tara Elizabeth Thompson, Therese Colleen King, Mayer, Brown, Rowe & Maw LLP, Chicago, IL, for Plaintiff.

Terrence Patrick Canade, John F. Kloecker, Theresa L. Duckett, Lord, Bissell & Brook, Chicago, IL, for Defendants.

### ORDER

GUZMAN, District Judge.

Plaintiff sues for failure to provide medical benefits under ERISA and moves the court for a temporary restraining order compelling defendant to provide health care insurance coverage under the Major Medical Group Insurance Policy through Concert Health Plan, Policy No. B050101 (the "Policy").[1] The basic facts are determined for purposes of this temporary restraining order procedure only. On April 6, 2005, Mr. Dolezal was diagnosed with multiple myeloma, a fatal blood cancer which can cause severe skeletal pain. Multiple myeloma is a cancer of the plasma cell (blood). In addition to disrupting the body's ability to produce healthy blood cells, the disease attacks the bones. Shortly after his diagnosis, Mr. Dolezal began standard chemotherapy, for which the defendant paid pursuant to the Policy. After finishing conventional chemotherapy, Mr. Dolezal's doctors prescribed an autologous stem cell transplant as a medically necessary treatment. The efficacy of autologous stem cell transplant treatment for patients with Mr. Dolezal's condition is conceded. Nevertheless, the defendant, Concert Health Plan (the "Plan" or "Concert"), has refused coverage claiming that autologous stem cell transplant (also re-

---

1. Plaintiff's motion requests preliminary and permanent injunctive relief. However, prior to the commencement of the hearing, plaintiff and defendant agreed that the motion should be considered as a motion for a temporary restraining order.

ferred to as bone marrow transplant) treatment is not covered under the policy language for the disease of multiple myeloma.

In order to obtain preliminary injunctive relief Mr. Dolezal must establish that: (1) his case has "some likelihood" of success on the merits; (2) no adequate remedy at law exists; and (3) he will suffer irreparable harm if the injunction is not granted.

 Success on the merits in this case means establishing that: (1) ERISA governs the policy; (2) plaintiff is a participant or beneficiary of the policy; and (3) he has been wrongfully denied benefits. 29 U.S.C. § 1132(a)(1)(B); *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). There is no dispute at this point that the policy is covered by ERISA and that Mr. Dolezal is a beneficiary of the policy. The central dispute in this case revolves around the third requirement, i.e., whether Concert was wrong in determining that the Plan does not provide the benefits plaintiff seeks. ERISA is not particularly helpful in determining the standard of review the court must apply to the challenged determination by a plan administrator. It "does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In *Firestone,* the Court noted that "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of the terms in the plan at issue," holding "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under *a de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe terms of the plan." *Id.* at 956–57. Thus, unless the plan provides discretion

to the administrator or fiduciary, by default, the standard of review will be *de novo.* Further, "[w]here the administrator has made no factual determination in denying plan benefits the district court should apply *a de novo* standard of review and arrive at its own factual findings in determining whether benefits were properly denied." *Casey v. Uddeholm,* 32 F.3d 1094, 1099 (7th Cir.1994). In the Seventh Circuit, "[w]here a plan confers power on the administrator to exercise discretion, the appropriate standard of review is the deferential 'arbitrary and capricious' one." *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan,* 144 F.3d 1014, 1019 (7th Cir.1998). This standard is also commonly referred to as an abuse of discretion standard. In this case, the parties agree that because the Policy reserves to Concert the ability to determine plan benefits, the court should review Concert's denial of such benefits under an "arbitrary and capricious" standard. Because the parties agree, the court will proceed under the arbitrary and capricious standard.

The determination to deny benefits was made, at least initially, solely by Concert's president and major shareholder, Dr. Jafari. In his letter of July 7, 2005, Dr. Jafari denied the request for preauthorization on the basis that Section 3 under "Covered Medical Services" in the Policy does not cover stem cell transplant for multiple myeloma. In a June 30, 2005 letter responding to a letter from Dr. Mehta which described the language of the Policy as outdated, Dr. Jafari states that stem cell transplant for multiple myeloma "remains to be a policy exclusion under the member's benefit plan." This determination, then, is based upon the exclusionary language of Section 3. Apparently this determination was based solely on Dr. Jafari's review of *The Merck Manual,* a rudimentary and brief encyclopedia of medical con-

ditions. Such a review could take no more than 15 minutes. Apparently this 15–minute review is what Concert was referring to when it offered "a statement of the clinical standards used in making this determination" in its June 30, 2005 letter. From this manual, Dr. Jafari concluded that multiple myeloma is a cancer of the bone.[2] Concert now admits that this conclusion is incorrect. Subsequently, in what appears to be its final letter of denial, Concert, this time by letter of July 27, 2005 from Burke A. Christensen, JD, CLU, Chief Operating Officer, states, "The denial was based on the terms of the policy which did not provide coverage for this transplant." The letter further provided, "the policy does not provide benefits for services that are not listed as a covered expense." It is unclear from this language whether this last denial is based upon a determination that multiple myeloma is not specifically included as a covered condition or upon a determination that multiple myeloma is specifically excluded as a covered condition, or both.

▮ To determine whether Concert's determination was arbitrary and capricious the court is required to interpret the relevant language in the Policy. That language is found in Pg. 23, Section 3 (Covered Medical Services) of the Plan:

Your benefits for certain human organ transplants are the same as Your benefits for any other condition. However, benefits will be provided only for corneahim, kidney, heart valve, muscularskeletal, parathyroid, heart, lung, heart/lung, liver, pancreas, or pancreas/kidney human organ or tissue transplants. Benefits will be provided for bone marrow transplants (allogenic, autologous and peripheral blood stem cells) transplants (*sic*), but only for certain types of leukemia, neuroblastomas, lymphomas, Ewing's sarcoma, aplastic anemia, Wiskott–Aldridge syndrome, severe combined immun-deficiency syndrome, and breast cancer. We will not cover bone marrow transplants (allogenic, autologous and peripheral blood stem cells) for treatment of cancers or diseases of the brain, bone, large bowel, ovary, small bowel, testicle, esophagus, kidney, liver, lungs, pharynx, prostate, skin, connective tissue and uterus.

The parties interpret this language in radically different ways. Plaintiff maintains that the language is ambiguous because it provides for certain types of leukemia, neuroblastomas, and lymphomas, but never spells out which types, nor does it give any criteria whatsoever by which the determination will be made.

▮ A further ambiguity, plaintiff points out, is that the policy provides a list of conditions for which bone marrow transplant treatment will be covered and immediately thereafter a list of conditions for which it will not be covered, but neither list specifically names multiple myeloma. If the sentence specifying specific cancers for which coverage is provided were meant to be exclusive, then the next sentence (listing those cancers for which coverage is excluded) would be superfluous. Thus, the policy language leaves a number of conditions as neither specifically included, nor specifically excluded. Ambiguous terms in an ERISA plan are to be strictly construed in favor of the insured. *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302,

---

**2.** Even in his interpretation of *The Merck Manual's* text, Dr. Jafari was incorrect. The manual does not describe Multiple Myeloma as a cancer of the bone, but rather as the most common *cause* of bone tumors (Pg.467), as a progressive neoplastic disease characterized by plasma cell tumors.(Pg 965), and as a malignant plasma cell dyscrasias (Pg.964). *The Merck Manual* (17th ed.1999)(emphasis added).

308 (7th Cir.1992). Further, when construing ambiguous terms "the insured's proposed reading must be reasonable." *Harnischfeger Corp. v. Harbor Ins. Co.,* 927 F.2d 974, 976 (7th Cir.1991). Resolving such an ambiguity against the drafter of the policy would result in coverage for the conditions not specifically excluded.

■ Finally, the Policy does not spell out whether or not multiple myeloma is to be considered a type of leukemia or lymphoma. This is a factual question. To determine this one must look outside the corners of the policy. A term in an insurance policy is ambiguous if there is "genuine (meaning, substantial) uncertainty, not resolvable by other means" in interpreting the term.

Plaintiff also points out that the first sentence in the above policy quotation establishes the same general right to benefits for transplant treatments as for any other condition. Therefore, plaintiff argues, the limiting language that follows is exclusionary and, as such, defendant has a heavy burden to establish unequivocally that the treatment plaintiff seeks is in fact excluded. "Where, as here, an insurer denies a duty to defend based on an exclusionary clause within a policy, its application must be clear and free from doubt." *Hurst–Rosche Engineers, Inc. v. Commercial Union Ins. Co.* 51 F.3d 1336, 1342 (7th Cir.1995) (citation omitted). Similarly, the third sentence, which states that, "Benefits will be provided for bone marrow transplants ... but only for certain types ....," also establishes a general right to bone marrow transplants and the "but only for certain types" language creates an exclusion from the general right which must be clear and unequivocal in order to apply. Because the standard in order to establish exclusions is stringent and ambiguous terms are to be strictly construed in favor of the insured, the refusal to extend coverage is arbitrary and capricious as it has no rational relationship to the language of the policy.

Plaintiff has submitted extrinsic facts that support an interpretation which includes coverage for bone marrow transplant treatment for beneficiaries suffering from multiple myeloma. Specifically, plaintiff points out that the affidavit of Mr. Dolezal's treating physician, a highly-credentialed expert in the field, establishes that: "Leukemia, lymphoma, and multiple myeloma are all closely related hematological (i.e., 'blood') cancers that are lymphoproliferative disorders. In fact, multiple myeloma is classified as a type of 'lymphoid neoplasm'. The updated revised European American lymphoma classification system includes lymphoma, multiple myeloma and leukemia." (Mehta affidavit, Pg. 2). Other medical publications also classified multiple myeloma as a type of lymphoma. Thus, when the policy provides that benefits will be provided for bone marrow transplants for certain types of leukemia and lymphomas, a determination that such language clearly and unequivocally excludes multiple myeloma is arbitrary and capricious. Such a conclusion is especially likely if, as the record here seems to support, the determination was made without even considering these sources of information. Furthermore, the only specific exclusionary language: "We will not cover bone marrow transplants (allogenic, autologous and peripheral blood stem cells) for treatment of cancers or diseases of the brain, bone, large bowel, ovary, small bowel, testicle, esophagus, kidney, liver, lungs, pharynx, prostate, skinned, connective tissue and uterus," does not list multiple myeloma. Multiple myeloma, plaintiff submits, is not even similar in kind to the cancers which are expressly excluded. (Mehta Aff. ¶ 26; Singlhal Aff. ¶ 15; Rosen Aff. ¶ 17.)

Plaintiff also argues out that the intent of the Policy's language is to include coverage for those conditions for which bone marrow transplant treatment is a medically accepted treatment and exclude coverage for those conditions for which bone marrow transplant treatment has not been proven effective. The language, however, is out of date and has not been revised and brought up to date. While in the past, the conditions specifically listed as covered for bone marrow transplant treatment were the only ones for which the treatment was accepted as effective, that is no longer the case. The parties agree that today bone marrow transplant treatment is the correct and medically accepted treatment for plaintiff's condition. Therefore, plaintiff argues, a denial of coverage is not only wrong, but unreasonable given the intent of the Policy's drafter.

■ Finally, plaintiff points out that the defendant's determination in this case is suspect because the person making the determination has been inconsistent in his reasons for the denial and has a strong conflict of interest as the single largest shareholder of the defendant corporation. As such, he has a direct pecuniary interest in denying coverage for a potentially very expensive treatment:

> The deferential standard that courts use in reviewing determinations made by trustees to whom the plan gives discretion to interpret—the "arbitrary and capricious" standard, *Firestone Tire & Rubber Co. v. Bruch, supra,* 489 U.S. at 115, 109 S.Ct. 948, 103 L.Ed.2d 80; *Dabertin v. HCR Manor Care, Inc.,* 373 F.3d 822, 827–28 (7th Cir.2004); *Daill v. Sheet Metal Workers' Local 73 Pension Fund,* 100 F.3d 62, 67–68 (7th Cir.

1996)—is "a range, not a point." *243 *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1052–53 (7th Cir.1988). It is "a sliding scale" that requires that judicial review be "more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is." *Id.* A conflict of interest on the part of the plan's trustees may start a slide. *Chojnacki v. Georgia–Pacific Corp.,* 108 F.3d 810, 815 (7th Cir.1997).

*Manny v. Central States, Southeast and Southwest Areas Pension and Health and Welfare Funds* 388 F.3d 241, 242–43 (7th Cir.2004)

Dr. Jarari's initial denial on factual grounds, his claim that multiple myeloma was a cancer of the bone and as such specifically excluded by the policy language, and his subsequent change to a different basis for denial when confronted with irrefutable evidence that the basis for his initial denial was clearly incorrect, indicates a predisposition to deny regardless of the actual merits of the claim.[3] Such a denial would be arbitrary and capricious. Further circumstantial evidence of such a predisposition is found in the fact that Concert, after initially denying the claim, directed Mr. Dolezal to undergo additional pre-transplant tests; which he did. However, even before receiving the results of the medical tests which it had required, Concert again denied Mr. Dolezal's claim. This claim consideration history suggests that Dr. Jafari, rather than looking objectively for facts to help him determine whether the claim was covered by the language in the policy, was instead looking for any possible way to deny the claim. Having failed to find a sustainable basis

---

**3.** Initially, the plan administrator, himself a doctor, denied coverage based upon the clearly erroneous factual determination that multiple myeloma is a cancer of the bone. Defendant now concedes that this is incorrect and the disease in question is a cancer of the blood.

for denial initially, he then required further testing, but without waiting for the results of the tests, Dr. Jafari apparently issued a new denial as soon as he found a new reason for denial in the policy language. Apparently, the test results no longer mattered. Nor is there any evidence in the record to suggest that Dr. Jafari did, or required, any substantial research to determine whether or not multiple myeloma, a disease with which he was obviously unfamiliar, is classified as a leukemia or lymphoma before issuing his second denial. A determination without such research, that is on no criteria whatsoever, is one without any logical basis and is not reasonable.

Concert argues just the opposite. Concert describes Dr. Jafari's initial refusal to provide coverage on the basis that multiple myeloma is a bone cancer, as a "temporary contention" which it acknowledges was inaccurate. Further, Mr. Dolezal's decisions have stopped short of ever saying that the multiple myeloma is a type of leukemia or a lymphoma. For this reason, in its final denial of July 27, 2005, Concert maintained its original determination that the policy does not provide benefits for the proposed bone marrow transplant. What is missing from this assertion is any indication of the criteria and/or research Dr. Jafari relied upon in coming to his subsequent conclusion that multiple myeloma is not covered by the language of the policy.[4] It is apparent that his initial determination was based on a cursory and totally inadequate review of The Merck Manual, an inadequate reference for the task at hand, the results of which he misinterpreted. Clearly, this grossly inadequate process does not constitute a reasonable determination. A careful reading of and action in accordance with the plain meaning of ordinary

language in a policy might be sufficient to pass muster under the arbitrary and capricious standard of review. But when the review entails interpreting highly specialized medical terms such as "multiple myeloma," "leukemia," and "lymphoma" and their possible relationship, either a decision maker with sufficient expertise or some minimally competent research is required—even under the arbitrary and capricious standard of review. The record here is completely devoid of any such effort. Instead, in its response, Concert seems content to point out the failings of the materials and affidavits submitted by plaintiff. Concert refers to the language at issue as "the plain Policy language." The court finds nothing plain about the medical terminology contained in the relevant language. In order to make a reasonable determination of the meaning of these terms the decision maker must have and reasonably exercise specialized knowledge. What little information there is in the record in that regard tends to indicate, as pointed out above, that the decision maker in this case, Dr. Jafari, had no such knowledge, did only the most flimsy research, and misinterpreted the results of his review, at that.

Concert argues that the coverage language above quoted does not establish a general right to transplant treatment with specific exclusions carved out, but rather spells out a narrow right to certain transplant procedures only under certain circumstances and, therefore, does not invoke the heavy burden plaintiff would require. Nor does the contract language require parol evidence to properly interpret it as it is not ambiguous. The list of conditions for which bone marrow transplant treatment is covered does not include multiple myeloma and therefore the treatment is

---

4. There is some dispute as to whether Dr. Jafari is the plan administrator. What is

clear from the submissions, however, is that Dr. Jafari was the decision maker in this case.

not covered in this case. At any rate, given the Policy's language, such a determination by the defendant cannot be considered arbitrary and capricious.

Concert also disputes that any irreparable harm to Mr. Dolezal would flow directly from its refusal to provide insurance coverage. Rather, Concert argues, any harm to plaintiff will come from the failure to obtain the bone marrow transplant procedure itself. Concert is not physically impeding the plaintiff from having the procedure and does not concede that the health care provider will actually refuse to provide the procedure if insurance coverage is not obtained.

The court agrees with plaintiff that the policy language, in the context of this case, is ambiguous. It is subject to more than one reasonable interpretation. The court also agrees that given the evidence submitted by plaintiff regarding the proper interpretation of the policy language, the meaning of the medical terms, the manner in which the determination to deny coverage was reached, and the conflict of interest of the decision maker, plaintiff has established a better than negligible likelihood of success on the merits in this case. At this stage, that is all that is required. *Roland Mach. Co. v. Dresser Indus. Inc.*, 749 F.2d 380, 386 (7th Cir.1984).

■ The court also finds that plaintiff has established a lack of an adequate remedy at law and irreparable harm. Plaintiff states that he has been denied the opportunity for bone marrow transplant treatment because his health insurer refuses to pay for it and he cannot afford the procedure on his own. Plaintiff further asserts, without contradiction, that the treatment, crucial to his survival, has already been delayed by over two months due to his inability to present proof of insurance coverage to his health care provider. The delay has put plaintiff at risk for kidney

failure, infections, skeletal problems and premature death. Further delay could result in plaintiff's physical condition deteriorating to the point the he is no longer *medically* eligible for the bone marrow transplant treatment. Given that the disease is life threatening, if not terminal, and that failure to undergo this treatment has such drastic consequences, it is not likely that treatment, the cost of which could be as much as $1 million, would have been delayed if the health care provider had been willing to provide the treatment, regardless of insurance coverage.

Further, the harm to plaintiff is clearly irreparable. The harm plaintiff faces goes beyond mere monetary damages, it includes, ultimately, the shortening of his life. Such a loss is irreparable and without an adequate remedy at law. The harm to plaintiff of wrongfully refusing a temporary restraining order greatly outweighs any harm to defendant of wrongfully granting such an order. Nor has the court been presented with any convincing public policy reason for denying the relief requested.

Defendant rightfully points out that the circumstances of this case are different from the usual temporary restraining order situation. The defendant is not physically engaged in any conduct directly harming plaintiff. What is requested is affirmative injunctive relief which entails interpretation of the agreement between the parties and an affirmative injunction directing defendants to comply with the agreement as interpreted. This is unusual. However, in order to maintain the status quo in this particular situation, that is precisely what is required. Without such an order it is possible that Mr. Dolezal's physical condition will deteriorate to the point where he will be medically ineligible for the procedure for which he seeks coverage. At that point, any ruling defin-

ing Concert's obligation to render coverage for such treatment would be moot as it would be of no practical benefit to Mr. Dolezal. The court finds that emergency relief is appropriate under such circumstances as the only practical means by which to preserve the status quo. However, such relief must be temporary in order to avoid, in effect, determining the entire legal issue before the court, i.e., full permanent injunctive relief, based upon an abbreviated procedure designed only to preserve the status quo.

Neither party has addressed the issue of an appropriate bond. Therefore, the court will require a $10,000 bond be posted.

Concert Health Plan, d/b/a Concert Health Plan Insurance Company is ordered to provide proof of health-care insurance coverage for the prescribed high-dose chemotherapy followed by an autologous stem cell transplant treatment to plaintiff's health care provider within 24 hours of the issuance of this order. This order and defendant's obligation to pay such coverage shall remain in effect through October 4, 2005 unless extended by the court or by agreement of the parties. Plaintiff's preliminary injunction motion is referred to Magistrate Judge Mason for a hearing and report and recommendation. The parties are directed to contact Judge Mason's chambers to arrange a date at the court's earliest convenience for plaintiff's motion for preliminary injunction.

**SO ORDERED.**