PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GREGORY PARSONS; DAVID BOOTHE;
UNITED MINE WORKERS OF
AMERICA,

$\quad\quad\quad$ *Plaintiffs-Appellees,*

$\quad\quad\quad\quad$ v.

POWER MOUNTAIN COAL COMPANY,

$\quad\quad\quad$ *Defendant-Appellant.*

No. 09-1822

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
David A. Faber, Senior District Judge.
(2:07-cv-00719)

Argued: March 24, 2010

Decided: May 5, 2010

Before TRAXLER, Chief Judge, and WILKINSON
and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Chief Judge Traxler and Judge Duncan
joined.

## COUNSEL

**ARGUED**: John R. Woodrum, OGLETREE, DEAKINS,
NASH, SMOAK & STEWART, PC, Washington, D.C., for

Appellant. Bradley James Pyles, PYLES & TURNER, LLP, Logan, West Virginia, for Appellees. **ON BRIEF:** W. Gregory Mott, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, Washington, D.C., for Appellant.

## OPINION

WILKINSON, Circuit Judge:

This case involves a claim by two former coal miners, Gregory Parsons and David Boothe, to collect retirement health benefits allegedly owed to them by Power Mountain Coal Company ("Power Mountain"), a coal operator in West Virginia. Under the terms of a collective bargaining agreement to which Power Mountain was a signatory, a coal operator is responsible for the health benefits of certain miners "whose last signatory classified employment was with such Employer." Power Mountain asserted that it was not their last signatory employer, but the designated arbitrators under the collective bargaining scheme disagreed. The district court upheld the arbitrators' decisions, and we affirm. Lest we risk the disruption of the carefully negotiated rules governing labor-management relations within the coal industry, we decline to second-guess the judgment of arbitrators interpreting a complicated collective bargaining scheme comprised of interwoven agreements.

### I.

### A.

Parsons and Boothe are UMWA members who worked for many years as coal miners for Pehem Industries ("Pehem"), a company that at one time operated a coal preparation plant in West Virginia. In 1997, Parsons and Boothe were laid off from their jobs with Pehem.

Later that same year, Power Mountain purchased the plant where Parsons and Boothe had previously worked. As a result of its purchase, Power Mountain became subject to two labor contracts between the UMWA and numerous coal operators. Specifically, Power Mountain assumed its predecessor's obligations under the National Bituminous Coal Wage Agreement of 1993 ("1993 NBCWA") and also became a direct signatory to the National Bituminous Coal Wage Agreement of 1998 ("1998 NBCWA"). Power Mountain also inherited a duty to honor the "panel rights" of Pehem's laid-off employees. Under the panel system, laid-off employees were placed on a panel and given the opportunity to be recalled back to employment, in order of seniority, for any work falling within the scope of the 1998 NBCWA's work jurisdiction clause.

While the 1998 NBCWA was in effect, however, Power Mountain hired non-union contractors for work allegedly falling under the 1998 NBCWA's work jurisdiction clause. As a result, a number of UMWA members, including several panel members, filed grievances against Power Mountain, seeking to collect pay for the work they claimed they were contractually entitled to perform. Without admitting liability, Power Mountain settled the grievances for a total of almost $43,000 in two separate settlement agreements, one in 2002 and one in 2003. Both settlements were short and included brief disclaimers, reciting that the agreements would not set a precedent for future cases.

Neither agreement specified how the monies were to be distributed. As a practical matter, Power Mountain simply paid the bulk sum to the local union, which in turn distributed the proceeds in equal shares to those union members who likely would have been hired if not for the alleged violation. Specifically, the local union determined that if Power Mountain had not hired the non-union contractors, then Parsons and Boothe, given their relative seniority on the panel, would have been recalled to employment for Power Mountain. Parsons and Boothe therefore received a proportionate share of the

2002 and 2003 settlement proceeds. Power Mountain claims it had no knowledge of who might or did receive such distributions.

## B.

The settlement payments received by Parsons and Boothe gave rise to the claim for health benefits in this case. The central purpose of the 1998 NBCWA is to provide lifetime health benefits to retired, laid-off, and disabled UMWA members and their dependents. The 1998 NBCWA places the burden for these lifetime benefits on a miner's last signatory employer, and, if the last signatory employer is out of business, on the 1993 Benefit Plan.

To achieve its overarching goal of lifetime benefits, the 1998 NBCWA works in tandem with a set of separate plans and trusts, which establish a comprehensive, albeit complicated, scheme specifying who is eligible for what benefits and from whom. One such plan is the 1974 Pension Plan. All questions of pension eligibility are determined under the detailed rules of the 1974 Pension Plan, as adjudicated by the plan's trustees ("1974 Trustees"). As explained by Article VIII(A), "[t]he Trustees . . . shall have full and final determination as to all issues concerning eligibility for benefits."

In the instant case, the 1974 Trustees determined that as a result of the settlement payments, Power Mountain was required to pay retirement health benefits to Parsons and Boothe under Article XX(c)(3)(i) of the 1998 NBCWA, which requires an employer to provide certain health benefits to "pensioners under the 1974 Pension Plan and Trust whose last signatory classified employment was with such Employer." *See also* 1998 NBCWA, Art. XX(h). The Trustees' conclusion that Power Mountain was obligated to pay health benefits under this section rested on two findings.

The 1974 Trustees first determined that Parsons and Boothe were "pensioners under the 1974 Pension Plan and Trust" because they were eligible for a "Special Permanent Layoff Pension." To receive such a pension, a retired miner must have worked a minimum of twenty years of signatory service, with 1000 hours of "credited service" per year. In calculating the number of hours of "credited service," the 1974 Pension Plan treats hours actually worked and hours constructively worked virtually the same. In this sense, and consistent with the 1974 Trustees' past practice, settlement agreements may lead to awards of "credited service" if the settlement payments are "back pay" representing compensation for hours that the employee ought to have worked but did not. The basis for this general rule is Article I(A)(12), which provides that "back pay," which is "agreed to by an Employer [and] intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer," yields "credited service" for "hours worked." Using this provision, the 1974 Trustees interpreted the 2002 and 2003 settlement payments as "back pay," and the resulting adjustment to "credited service" for "hours worked" meant that Parsons and Boothe met the threshold for a "Special Permanent Layoff Pension."[1]

Second, the 1974 Trustees concluded that the settlement payments made Power Mountain Parsons and Boothe's last signatory employer. An employee's last signatory employer is the employer on his last day of "credited service." Here, because Parsons and Boothe's last day of "credited service" derived from settlement payments made by Power Mountain, it was attributable to Power Mountain. In other words, the 1974 Trustees found that the settlement agreements represented constructive employment and that Power Mountain's constructive employment of plaintiffs (paying them for hours

---

[1]Although Parsons and Boothe received payments under both the 2002 and the 2003 settlement agreements, Boothe received "credited service" on the basis of the 2002 agreement alone.

they did not work, but should have worked) was sufficient to make it their last signatory employer.

When Parsons and Boothe attempted to enroll in its health benefits plan, however, Power Mountain denied their claims, insisting that it was not their last signatory employer. In response, the UMWA invoked the Resolution of Dispute ("ROD") procedure under Article XX(e)(5) of the 1998 NBCWA. Under this provision, contested issues of health benefits are adjudicated by the Trustees of the 1993 Benefit Plan ("1993 Trustees"). After evaluating a disputed matter, the 1993 Trustees typically issue an opinion, commonly referred to as a "ROD," which "shall be final and binding on the parties." In RODs for both Parsons and Boothe, the 1993 Trustees informed Power Mountain that the subsidiary question of Parsons and Boothe's last signatory employer would be addressed by the 1974 Trustees through the procedure authorized by Article XX(g) of the 1998 NBCWA. Under this provision, the 1974 Trustees were authorized to "promptly investigate and determine the eligibility or ineligibility of any beneficiary whose right to receive benefits from the Trusts has been challenged by . . . any Employer."

As to both Parsons and Boothe, the 1974 Trustees re-affirmed their earlier conclusion that Power Mountain was properly named as the last signatory employer and informed the 1993 Trustees of this determination in a thoroughly reasoned letter. The 1993 Trustees issued ROD opinions in Parsons's case on January 20, 2007, and in Boothe's case on October 24, 2007. In both rulings, the 1993 Trustees not only adopted the 1974 Trustees' decision on the issue of last signatory employer but also confirmed the existence of additional facts crucial to a determination of eligibility. The Trustees concluded Power Mountain was required to provide health benefits to Parsons and Boothe.

When Power Mountain refused to comply with the ROD decisions, the UMWA, Parsons, and Boothe sued in the

Southern District of West Virginia, seeking, in part, enforcement of the RODs as arbitration awards. The parties filed cross-motions for summary judgment, and the district court subsequently granted plaintiffs' motion for summary judgment and denied defendant's. *Parsons v. Power Mountain Coal Co.*, 2009 WL 899457 (S.D.W. Va. Mar. 31, 2009). The district court held that eligibility issues, including the last-signatory-employer issue, were subject to arbitration under the 1998 NBCWA, and that the RODs were thus subject to the deferential standard of review afforded to arbitration awards. *Id.* at *9. As the court explained, courts must enforce an arbitrator's decision on a matter properly submitted to arbitration so long as the decision "draws its essence from the agreement." *Id.* at *10 (citing *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). The court found that the RODs in this case satisfied this "circumscribed level of review" and that enforcement was therefore warranted. *Id.*

## II.

This court has previously recognized that ROD opinions, issued under the authority of the NBCWAs, are arbitration awards. *See, e.g.*, *Upshur Coals Corp. v. UMWA, Dist. 31*, 933 F.2d 225, 227-28 (4th Cir. 1991). And arbitration awards are entitled to considerable deference. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987). As the Supreme Court has instructed: "Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, . . . courts play only a limited role [in] review[ing] the decision of an arbitrator." *Id.*

Under this standard, we must uphold a ROD so long as it "draws its essence from the collective bargaining agreement" and is not merely the arbitrator's "own brand of industrial jus-

tice." *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38; *see also Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 608 (4th Cir. 1996).

Power Mountain contends, however, that the RODs must be overturned, either because they do not deserve the usual deferential review or because they do not survive it. In appealing the district court's ruling, Power Mountain asserts several grounds of error. We address each in turn.

A.

Power Mountain begins by arguing that the standard of review generally applicable to arbitration awards does not apply here, at least not to the precise question of whether Power Mountain was plaintiffs' last signatory employer. As to this issue, Power Mountain contends there was an impermissible delegation. According to Power Mountain, the 1993 Trustees had an arbitral duty to decide the last-signatory-employer issue, and their referral of the issue to the 1974 Trustees therefore constituted an abdication of their authority as arbitrators. Under these circumstances, Power Mountain suggests that the last-signatory-employer designation is entitled to "no deference."[2]

---

[2]Power Mountain also appears to argue that even if the 1993 Trustees were permitted to consult the 1974 Trustees on the last-signatory-employer issue, their decision to do so removed the issue from the context of arbitration altogether—and hence from the standard of review applicable to arbitration decisions. But the ROD process fully contemplates the 1974 Trustees deciding the issue of last signatory employer. The 1974 Trustees' ruling and the 1993 Trustees' decision to adopt it are themselves part of the arbitration decision to which we must defer.

We find this argument unpersuasive. Reviewing questions of a labor arbitrator's authority *de novo*, *Mountaineer*, 76 F.3d at 608, we see nothing improper about the 1993 Trustees' choice to request and accept the 1974 Trustees' decision on the singular issue of whether Power Mountain was plaintiffs' last signatory employer.

"The parties bargained for arbitration . . . and were free to set the procedural rules for arbitrators to follow if they chose." *Misco*, 484 U.S. at 39. Here, by signing the 1998 NBCWA, Power Mountain opted to give the 1993 Trustees considerable leeway as arbitrators. Article XX(e)(5) of the 1998 NBCWA imbues the 1993 Trustees with complete authority to resolve disputes in "final and binding" decisions and further permits them, without limitations, to "develop procedures for the resolution of such disputes." Nothing in the agreement constrains their ability to consult the 1974 Trustees.

In fact, the 1993 Trustees' decision to enlist the advice of the 1974 Trustees was fully contemplated by the collective bargaining agreements in place. Several provisions support this conclusion. As the 1993 Trustees noted in their RODs, Article XX(g) of the 1998 NBCWA assigns to the 1974 Trustees the task of "promptly investigat[ing] and determin[ing] the eligibility or ineligibility of any beneficiary whose right to receive benefits from the Trusts has been challenged by . . . any Employer." Moreover, Article VIII(B)(13) of the 1974 Pension Plan cloaks the 1974 Trustees with the "further powers contained in" the ROD provision of the 1998 NBCWA, thereby indicating that the 1974 Trustees' responsibilities do not necessarily cease once the ROD process begins. Finally, and importantly, Article VIII(A) of the 1974 Pension Plan vests in the 1974 Trustees a "full and final determination" power as to "all issues concerning eligibility for benefits." This court has repeatedly recognized that this provision imparts broad discretionary authority to the 1974 Trustees. *See Sargent v. Holland*, 114 F.3d 33, 35 (4th Cir. 1997); *Lockhart v. UMWA 1974 Pension Trust*, 5 F.3d 74, 77 (4th

Cir. 1993); *Boyd v. Trs. of UMWA Health & Ret. Funds*, 873 F.2d 57, 59 (4th Cir. 1989); *see also Baker v. UMWA Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

Power Mountain, however, responds that the 1974 Trustees were given the power only to determine eligibility for *pension* benefits, not *health* benefits. This argument is unavailing. Whatever allure such a bright-line distinction between pension and health benefits might have in theory, it breaks down in practice where, as here, issues of pension and health benefits are so intimately related that they are impossible to untangle. In this case, for example, Power Mountain's liability for health benefits depended on plaintiffs' eligibility for pension benefits. Only if the settlement agreements constituted "back pay" warranting "credited service" did plaintiffs become entitled to a pension, and only if they were entitled to a pension could they collect health benefits from their last signatory employer. In addition, Power Mountain's status as last signatory employer for health-benefits purposes depended on plaintiffs' last day of "credited service" for pension eligibility purposes.

Moreover, the 1993 Trustees themselves decided the larger issue of whether Parsons and Boothe were eligible for health benefits, calling upon the 1974 Trustees' expertise only as to a solitary, narrow question. Power Mountain's status as last signatory employer was but a small piece of the health-benefits puzzle. To support its ultimate conclusion that Power Mountain was responsible for plaintiffs' health benefits, the 1993 Trustees needed to first establish that plaintiffs were entitled to health benefits at all. They therefore addressed whether plaintiffs met the service hours and age requirements, determined the effective dates of eligibility, and identified the agreements to which Power Mountain was a signatory. Far from simply handing over their duties, the 1993 Trustees retained for themselves several crucial aspects of Parsons and Boothe's claims. Thus, because the 1993 Trustees performed

their arbitral role consistently with the ROD procedure under the 1998 NBCWA, their ROD opinions warrant deference.

## B.

Power Mountain next argues that the district court erred in enforcing the RODs because the 1993 Trustees are not neutral arbitrators. Under the collective bargaining agreements, the 1993 Benefit Plan, which the 1993 Trustees administer, is obligated to pay the benefits of any retired employees whose last signatory employer is out of business. If the 1993 Benefit Plan decided that Pehem rather than Power Mountain was Parsons and Boothe's last signatory employer, the 1993 Benefit Plan would have had to pay their benefits, inasmuch as Pehem was out of business. Power Mountain contends that this conflict of interest warrants overturning the RODs. In support, it relies primarily on the Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2346 (2008), which held that when an employer administers an employee benefit plan, both "determin[ing] whether an employee is eligible for benefits and pay[ing] benefits out of its own pocket," there is a conflict of interest that "a reviewing court should consider . . . in determining whether the plan administrator has abused its discretion." *See also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Under *Glenn*, however, a conflict of interest is simply one factor among many to be weighed, *Glenn*, 128 S.Ct. at 2351-52, and by no means compels reversal. We also note that the conflict in *Glenn* was weighed in the context of a court's abuse of discretion review, *id.* at 2346, while any potential conflict in this case would be considered in the context of the even more forgiving standard of review for arbitration decisions.

And this case is also quite different from *Glenn*. The conflict of interest *Glenn* envisioned was one in which the plan administrator had a direct financial stake in eligibility deter-

minations, where "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket." *Id.* at 2348 (citation and internal quotations omitted). Here, by contrast, the 1993 Benefit Plan suffers no economic hardship when the 1993 Trustees award additional benefits. It is funded by multiple employers, who pay a defined contribution regardless of what benefits are awarded. *See* 1998 NBCWA, Art. XX(d). If benefits are not awarded, those funds remain for future claims. And if funds run out, benefits are simply modified so that the only detriment accrues to the employees who would otherwise receive greater benefits from the 1993 Benefit Plan. *See* 1998 NBCWA, General Description. In an analogous situation, this court held that the trustees of a "fully funded, defined-benefit plan" had no conflict of interest, even though they made benefits determinations that stood to save or cost the plan "substantial sums." *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191 (4th Cir. 1989). "That plan administrators' decisions have had a favorable impact on the balance sheet of the trust itself . . . suggests no 'conflict of interest.'" *Id.*; *see also Manny v. Cent. States, S.E. & S.W. Areas Pension & Health & Welfare Funds*, 388 F.3d 241, 242-43 (7th Cir. 2004) (same).

Furthermore, while we acknowledge that a court must account for a conflict of interest even where a "settlor . . . approves a trustee's conflict," *see Glenn*, 128 S.Ct. at 2349, we do not think it irrelevant that the 1993 Trustees' role here, despite any possible conflict of interest, was approved by, among others, Power Mountain itself. As a signatory to the 1998 NBCWA, Power Mountain designated the 1993 Trustees as arbitrators, knowing that they would both play a role in eligibility determinations and act on behalf of a trust affected by those determinations. As the district court explained, "it was precisely this framework which defendant bargained for in entering into the agreement." *Parsons v. Power Mountain Coal Co.*, 2009 WL 899457, at *10 (S.D.W. Va. Mar. 31, 2009).

## C.

Finally, Power Mountain contends that even if the very limited judicial review applicable to arbitration awards were to apply, the two RODs in this case must be overturned because they fail to "draw [their] essence from the collective bargaining agreement." *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). Its primary argument is that actual employment is necessary for the purposes of the last-signatory-employer inquiry. Power Mountain insists it cannot possibly be plaintiffs' last signatory employer because it never employed them to perform any actual work.

Whatever the intuitive appeal of this claim, it is plainly unsupported by the language of the various collective bargaining agreements, which make no distinction between constructive and actual employment for purposes of benefits eligibility. Under Article I(A)(12) of the 1974 Pension Plan, "credited service" is granted both for hours an employee actually worked and for "back pay" hours an employee should have worked and been compensated. In addition, such "credited service" is used to determine a miner's last signatory employer, regardless of whether that "credited service" arose from actual or constructive hours.

In case there was any doubt, the 1974 Trustees clarified these rules in a set of guidelines unambiguously entitled "Guidelines for Awarding Pension Credit Based on Back Pay Awards or Settlement Agreements," which were created specifically "to clarify the types of awards or settlements that may qualify for back pay pension credit." These Guidelines recognize that settlement agreements may count as "back pay" awards of "credited service" and, further, that a miner might be "entitled to back pay because an employer failed to properly hire him off a recall panel."

In the arbitration context as well, the 1993 Trustees have previously acknowledged in RODs that settlements may lead

to "credited service," which may in turn trigger an employer's liability for health benefits. *See* RODs Nos. 81-422; 81-466; 81-632. The 1993 Trustees themselves summarized their precedent as standing for the proposition that "an Employee awarded backpay from an employer for a particular period shall be considered to have 'worked' for the employer and is therefore entitled to health benefits coverage on the basis of such constructive employment." ROD No. 84-588.

Stated bluntly, it is unremarkable that Power Mountain could become plaintiffs' last signatory employer without employing them to perform actual work. It is charged with knowledge of the agreements to which it subscribed. As a sophisticated actor operating in the context of a transparent contractual scheme, Power Mountain may not now complain that it was unaware that the settlement agreements could trigger its responsibility to unknown employees for health benefits.

Alternatively, Power Mountain makes the argument that even if constructive employment may suffice in some cases, there was no constructive employment in this particular case. In Power Mountain's view, the settlement agreements here are inadequate to justify an award of "credited service" because they do not contain the words "back pay," which are necessary to signal Power Mountain's intention to compensate plaintiffs for constructive employment.

To be sure, a settlement agreement generally counts as "back pay" only if the parties intend it to, and including the terms "back pay" within the agreement's text may be the surest way to manifest that intention. *See Francis v. Rodman Local Union 201 Pension Fund*, 367 F.3d 937 (D.C. Cir. 2004); ROD No. 84-588. These magic words, however, are not the exclusive method for conveying such an intent. As the 1974 Trustees' Guidelines make explicit, "[i]t is preferred that the words 'back pay' be included in the award or [settlement] agreement, but it is not mandatory." Rather, what is important

is simply that it be "clear from the text of the agreement that the intent is to provide an individual with payment for lost wages."

We cannot say that the RODs here must be reversed merely because they permitted the 2002 and 2003 settlement agreements to constitute "back pay" in the absence of that exact phrase. Under the deferential standard of review applicable to arbitration awards, we cannot perform so probing an inquiry into the RODs' merits as to scrutinize factual evidence of the parties' intent dating back to 2002 and 2003. It is more than enough to observe that a finding of such intent is not implausible here. For one thing, the language of the 2003 settlement agreement expressly acknowledges that the settlement sum is intended "to pay 300 hours of back wages . . . for the bargaining unit performed by contractors/supervisors." In context, "back wages" seems to hold an identical meaning to the term of art "back pay": compensation for hours that a miner ought to have worked. Moreover, the genesis of the grievances, and indeed the whole reason for the settlement agreement, was a claim by the miners that they were entitled to hourly pay for the work performed by the non-union contractors. The RODs in this case thus survive the requisite circumscribed review.

## D.

The "reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations," which "reflect a decided preference for private settlement of labor disputes." *Misco*, 484 U.S. at 37 (citing the Labor Management Relations Act of 1947, 29 U.S.C. § 173(d)). As this court has recognized, "[b]y submitting a dispute to arbitration, labor and management can secure a decisive resolution of their differences without the delay inherent in litigation or the disruption of a strike or lockout," and "arbitration can succeed in achieving these goals only to the extent it is accorded finality by the judiciary." *Richmond,*

*Fredericksburg & Potomac R.R. Co. v. Transp. Commc'ns Int'l Union*, 973 F.2d 276, 278 (4th Cir. 1992).

Among other things, by enforcing arbitration decisions as a presumptive matter, courts promote consistency in the interpretation of collective bargaining agreements. *See Sargent v. Holland*, 114 F.3d 33, 36 (4th Cir. 1997). The 1998 NBCWA must be interpreted consistently with federal statutes regulating the coal industry and with the industry trusts and employer plans that function under it. Determining benefits eligibility under these interlocking provisions puts a premium on the experience gained by trustees who deal with the plans day-in and day-out. *See id.* Of course, there remains the ultimate check of judicial review, but its purpose is to support, not to supplant, reasonable arbitration decisions. By casually replacing the 1993 Trustees' judgment with our own, we risk making a complete hash of a collective bargaining scheme that profoundly affects the coal industry and all who depend upon it.[3] Accordingly, we decline to overturn the RODs in this case and affirm the judgment of the district court.

*AFFIRMED*

---

[3]Power Mountain also argues that the disclaimer in the 2002 settlement agreement, which states that the agreement is not to be used as a precedent for future cases, prohibits use of the agreement for purposes of establishing responsibility for plaintiffs' health benefits. Power Mountain, however, failed to raise this objection in the ROD process, and the argument is therefore waived. In any event, Power Mountain's argument is foreclosed by *Dist. 29, United Mine Workers of America v. New River Co.*, 842 F.2d 734 (4th Cir. 1988). As compared to the comprehensive release in the settlement agreement there, *id.* at 735, the settlement here was, as the district court noted, "absolutely perfunctory." *Parsons v. Power Mountain Coal Co.*, 2009 WL 899457, at *11 (S.D.W. Va. Mar. 31, 2009). Additionally, unlike the employees in *New River*, Parsons and Boothe did not sign the agreement in this case or even know about its existence at the time it was signed.